## Community Legal Services, Inc.

Before Brown, P. J., Guerin and Alexander, JJ.

*John A. Papola, Lenard L. Wolffe* and *Samuel Smith*, for exceptants.

*William R. Klaus*, contra.

ALEXANDER, J., May 10, 1967.—On May 12, 1966, the incorporators of Community Legal Services, Inc., made application to this court for a charter under the provisions of the Nonprofit Corporation Law of May 5, 1933, P. L. 289, as amended, 15 PS §7001. Upon request of the incorporators, the court waived the appointment of a master and decided itself to sit and hear the application. Two lawyers, members of the bar, appeared pro se as objectors. After extensive hearings before the court, an opinion was filed and a decree

issued on June 30, 1966, granting the application: The Legal Intelligencer (Phila.), vol. 155, no. 1 (July 1, 1966) ; Welfare L. Bull. No. 6, p. 2 (December 1966). Since that date Community Legal Services, Inc., has, in pursuit of its purpose as a nonprofit corporation, assiduously and successfully made legal counsel available to low income citizens of Philadelphia.

On June 29, 1966, one day after the opinion and decree were filed, John A. Papola, Esq. and Leonard L. Wolffe, Esq. filed appearances pro se. It is their purported exceptions to the opinion and decree lodged July 7, 1966, that are now before this court en banc. The sole remedy of objectors in fact, being a direct appeal to the Pennsylvania Supreme Court, these exceptions are of no legal effect and must be dismissed. Moreover, the exceptions themselves are without merit. In the main, they were thoroughly and carefully considered in the opinion of June 30, 1966, and correctly dispatched there. Exceptants nonetheless continue to press two objections in particular: That the Canons of Professional Ethics and the Pennsylvania statute somehow bar the incorporation of Community Legal Services, and that this court is somehow bound to reject the neighborhood law office organization of legal services for the poor in favor of the English Plan. In the interests of full discussion and reasonable understanding of these matters of great importance to the public, to low income citizens and to the entire bar, though we had thought the extensive opinion of June 30, 1966 covering 71 pages, supra, would have sufficed, we heard exceptants out and we undertake now to address again their objections.

I.

Preliminarily, it must be noted that the purported exceptions filed here are null and void and of no legal effect. The court below did not refer the charter appli-

cation to a master, but rather waived the appointment of a master and itself fully heard the incorporators and the objectors. Section 207 of the Nonprofit Corporation Law, 15 PS §7207, which governs these proceedings, provides, in relevant part, as follows:

"The court shall consider the application. It may hear evidence, if any there be, on behalf of the applicants and against the application, *or it may refer the application to a master to make report as to the propriety of granting the application. In such case,* upon the filing of the master's report, the court shall grant the applicants and protestants a hearing, if exceptions are filed by either of them". (Italics supplied).

Section 207 clearly contemplates the filing of exceptions *only* where an application for a charter has been referred to a master. Where, as here, the court itself has heard evidence on the charter application, exceptions are not in order.

The only remedy from the decree of June 30, 1966, is an appeal in the nature of broad certiorari: Appeal of Vaux, 109 Pa. 497, 33 Pitts. L. J. (1885); Grand Lodge of the Ancient Order of United Workmen, 110 Pa. 613, 33 Pitts. L. J. 163 (1885). See also the recent cases reviewing Nottingham Fire Company Charter Case, 394 Pa. 631 (1959); Conversion Center Charter Case, 388 Pa. 239 (1957); Independent Garment Workers' Union of Valley View Case, 335 Pa. 209 (1939); In re Elkland Leather Workers' Association, Inc., 330 Pa. 78 (1938). As those cases make clear, a charter proceeding is not an action in equity. It is sui generis, Pennsylvania Rule of Civil Procedure 971. There is no question of a hearing of right before the Common Pleas Court en banc, and exceptions are not in order.

So we hold.

Further, before turning to the main points, it is

appropriate to consider two miscellaneous objections raised by the "exceptions".

1. All the findings requisite under the Nonprofit Corporation Law were made below in the opinion of the court at page 71 and in the decree of June 30, 1966. The court found the articles in proper form and within the provisions of the act, the purposes given in the articles lawful and not injurious to the community and the name available for use by the corporation. Detailed findings to support the conclusion that the purposes of a corporation are "not injurious to the community" are not required: Nottingham Fire Company Charter Case, 394 Pa. 627, 634-35 (1959).

". . . the Court finds that Community Legal Services is lawful, not injurious to the community and meets all of the standards under the Nonprofit Corporation Act. The Articles, as amended, are therefore approved.

"The Court further finds that the proposed CLS program serves the best interests of the Philadelphia community and of the Bar. The Philadelphia Bar Association has come forward with a program responsive to the great challenge of our times reflecting the highest traditions of the Philadelphia Bar, the oldest association of the organized Bar in America.

"The Philadelphia lawyers have overwhelmingly accepted the challenge that this opportunity affords in another area in the life of the poor to relieve the burden under which nearly a fifth of American families suffer.

"It is in the public interest that this program go forward.

"Let it begin—Now": Opinion of June 30, 1966, The Legal Intelligencer, July 1, 1966, p. 7, col. 5.

2. As the docket entries in this case, dated May 12, 1966, and June 13, 1966, make clear, the incorporators

paid the requisite fees in accordance with the rules of this court.

## II.

The two exceptants urge again, as brethren of theirs did before, that the incorporation of Community Legal Services offends the canons and Pennsylvania law. Then, and now, "(We) find that the CLS type of program does not violate the Canons of Ethics. . . . The contention that the incorporation of CLS is not in accord with the laws of Pennsylvania is also without basis": Opinion of June 30, 1966.

Exceptants, nonetheless, urge upon us Canon XXXV, 17 PS §1608, and the opinion of Breitel, J., for the New York Supreme Court, Appellate Division, First Department, *Application of Community Action for Legal Services*, 26 App. Div. 2d 354, 274 N. Y. S. 2d 779 (1966).

Canon XXXV adopted by the American Bar Association in 1928 and by the Pennsylvania Bar Association in 1934 (40th Ann. Rep., Pennsylvania Bar Association, 52-3, 218-19 (1934)) provides:

"The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer. . . . A lawyer's relation to his client should be personal, and the responsibility should be direct to the client. Charitable societies rendering aid to the indigent are not deemed such intermediaries".

This Canon, like Canons XXVII and XXVIII raised below and disposed of there, was drafted in a time of great apprehension about the challenge to the bar and the practice of law by laymen. The challenge from corporations, a form of organization invented by lawyers, was especially menacing: Sanders, "Foreword: The 'Unauthorized Practice of Law' Controversy", 5 Law and Contemp. Prob. 2 (1938). These canons were

56

devised not as a response to the legal problems of the poor but to restrict commercial merchandising of legal services for increased personal or corporate profit. Indeed, Canon XXXV explicitly excepted from the ban on intermediaries, organizations providing legal assistance to the poor.[1]

In the years after 1929, the movement to translate these concerns into statute law began. In 1933 the Pennsylvania Legislature amended a long-standing statute prohibiting the unauthorized practice of law expressly to prohibit, on pain of criminal punishment, the practice of law by corporations: Act of April 28, 1899, P. L. 117, as amended, 17 PS § 1608. Exceptants urge that this statute bars the incorporation of Community Legal Services. We cannot agree.

Construing 17 PS §1608 in Blair v. Motor Carriers Service, Inc., 40 D. & C. 413, 434 (1939), Judge Levinthal, then sitting in Common Pleas No. 6, wrote, "the practice of law by laymen and by all corporations *for profit* is unlawful in Pennsylvania" (Italics supplied). Without exception, the cases applying that statute have applied it against laymen and corporations for profit: E.g., Ginsburg v. Kovrak, 392 Pa. 143 (1958) ; Shortz v. Farrell, 327 Pa. 81 (1937) ; Childs v. Smeltzer, 315 Pa. 9 (1934) ; Kountz v. Rowlands, 90 Pa. L. J. Rep. 193 (1942) ; Burch v. Sigourney Mellor, 43 D. & C. 597 (1942) ; Shortz v. Yetter, 38 D. & C. 291 (1940). It has not been and cannot be applied, as its history and other considerations make clear, against nonprofit corporations providing legal assistance to low income citizens.

In 1931, the Pennsylvania Bar Association ap-

---

[1] The canons have been adopted as rules of court by Pennsylvania Rule of Civil Procedure 205. The rules, and, hence, the canons and Canon XXXV, have the force of statute: Act of June 21, 1937, P. L. 1982, 17 PS §61; Schofield Discipline Case, 362 Pa. 201 (1949).

pointed a Special Committee on the Practice of the Law. It was directed to investigate unauthorized practice: 37th Ann. Rep., Pennsylvania Bar Association. This committee prepared, and the association in 1932 approved, and proposed an act amending the Act of April 28, 1899, P. L. 117: 38th Ann. Rep., Pennsylvania Bar Association 240-43, 92-3 (1932). Substantially verbatim, this act was adopted by the Pennsylvania Legislature:[2] 39th Ann. Rep., Pennsylvania Bar Association 314-16 (1933). See also 40th Ann. Rep., Pennsylvania Bar Association 95 (1934). As the committee reports and discussion on the floor make clear, this act was addressed to "banks and trust companies, adjusters, real estate brokers, collection agencies, corporate organizers, and minor officials, such as notaries public and justices of the peace": 38th Ann. Rep., Pennsylvania Bar Association, 241.

Significantly, the annual address at the 1933 meeting of the association, where the passage of the act (17 PS §1608) was celebrated, was delivered by Allen Wardwell, Esq., on "Legal Aid". Nor was this an isolated concern of the Pennsylvania Bar Association. The Standing Committee on Legal Aid was established in 1923. The committee's annual reports were notable in their ardent and full consideration and support of legal aid efforts internationally, nationally and across the State. As evidenced by the following proud and

---

[2] The only change from the association's proposal was the addition of the proviso that "nothing herein contained shall be construed as prohibiting corporations of the first class (i. e., non-profit corporations) from rendering through attorneys at law legal service to the members of such corporations". The proviso was intended to clear up the situation with reference to legal advice given to members of automobile associations and other organizations employing counsel: 39th Ann. Rep., Pennsylvania Bar Association, 316.

justified statement in the committee's review of its work through 1932, the Pennsylvania Bar Association was well informed of the modes of legal aid:

"Legal aid work may be described as the machinery by which the organized bar lifts the poor man over the three obstacles of court costs, delay of court procedure, and expense of counsel; and sees to it that he secures the same brand of justice that anyone else receives. So many interesting and valuable experiments are taking place that your Committee feels it has a real part to play in collecting materials on these subjects and including it in the Report. In no other State Bar Association, so far as your Committee is aware, is there as extensive a compilation": 38th Ann. Rep., Pennsylvania Bar Association, 218.

See, e.g., 34th Ann. Rep., Pennsylvania Bar Association, 159 (1928); 37th Ann. Rep., Pennsylvania Bar Association (1931).

In 1932, legal aid societies were at work in Erie, Harrisburg, Philadelphia, Pittsburgh and Reading. More important, in the larger cities they were organized in the form of nonprofit corporations (then called corporations of the first class), Pittsburgh's Legal Aid Society having been incorporated in 1908 and Philadelphia's in 1916. The incorporation of a voluntary defender in Philadelphia was under discussion: 36th Ann. Rep., Pennsylvania Bar Association 111 (1930). Those who drafted the 1933 amendment and the legislature which adopted it were thus well aware that nonprofit corporations were making the services of lawyers available to low income citizens.[3]

---

[3] Beginning with the legal aid societies incorporated in New York and Chicago almost a century ago, legal aid has relied heavily upon the corporate form. Today, more than 75 percent of legal aid societies across country are incorporated: Allison, "Legal Aid Problems Still Exist", Legal Aid Briefcase 60 (Dec. 1966). The National Legal Aid and Defender Association recommends:

The Act of April 28, 1899, P. L. 117, as amended, 17 PS §1608, is a criminal statute and, hence, to be strictly construed; "unless . . . acts are clearly prohibited, there is no violation of the statute": LaBrum v. Commonwealth Title Company of Philadelphia, 358 Pa. 239, 243 (1948). As the court, construing 17 PS §1608 and applying it in light of the traditional practice of conveyancers in drawing leases and deeds, there said, at page 245:

"All this the legislature must have known when it passed the Act of 1899 and its amendments, but notwithstanding such knowledge, it is significant that the legislature gave no expression of intention to prohibit those practices".

Similarly, the legislature must have known of the established mode of legal aid organizations as nonprofit corporations. As in LaBrum, the act here challenged (the incorporation not for profit of a legal assistance organization) is not clearly prohibited and thus there is no violation of the statute.

Traditionally, legal aid organizations though organized in corporate form have not been regarded as "practicing law".[4] Thus, the Supreme Judicial Court of Massachusetts, addressing a criminal statute prohibiting corporations from the practice of law in terms virtually identical to the Pennsylvania statute, held:

"The gratuitous furnishing of legal aid to the poor

---

"Every legal aid organization . . . should be an independent not-for-profit organization (preferably a corporation) for the purpose of furnishing legal assistance". Handbook of Standards for Legal Aid and Defender Offices, p. 7.

[4] Significantly, the Act of April 23, 1899, as amended in 1933, did not undertake to define what constitutes the practice of law, but left that task in the hands of the courts: "The decisions of the courts as to what constitutes practice of the law have been almost uniformly satisfactory, and although there have been no decisions of our appellate courts, we have no reason to expect they will be any less satisfactory": 38th Ann. Rep. Pennsylvania Bar Association, 241-42 (1932).

and unfortunate without means in the pursuit of any civil remedy . . . do(es) not constitute the practice of law": In re Opinion of the Justices, 289 Mass. 607, 194 N. E. 313, 317-18 (1935).

The California Supreme Court invoked the same tradition in Miller Estate, 5 Cal. 2d 588, 55 P. 2d 491, 494 (1936):

"It is seriously urged . . . that the rendering of legal services by a county counsel to the Public Administrator . . . constitutes a violation of the prohibition against the practice of law by a corporation. . . . The county is no more practicing law than . . . when the Public Defender represents private persons in criminal cases. The . . . Public Defender, of course, practice(s) law—it is one of the qualifications of their office—but it is they who are practicing law, not the county".

In the leading case of Azzarello v. Legal Aid Society of Cleveland, 117 Ohio App. 471, 185 N. E. 2d 566, 570 (1962), the Ohio Court of Appeals, Cuyahoga County, held:

"The Legal Aid Society, (incorporated in 1905) . . . is only an agency of reference where the lawyers to whom indigent persons in need of legal services may look for compensation under a prearranged agreement. The funds under control of the Society are in no sense to be considered as its assets. The Society is only the channeling agency through which the funds of donors or public departments are given in response to a recognized public need. The Society, in carrying out its part in this necessary endeavor is not attempting to practice law or in its own interest acting as an intermediary for such purpose".

Thus, the Pennsylvania statute does not bar the incorporation of Community Legal Services. The statute was addressed not to legal aid corporations but to other concerns, as the history of the statute and the prior and continued incorporation of legal aid

societies indicates. Such corporations have consistently not been regarded as engaged in the practice of law. Any other conclusion would raise serious constitutional questions.

In the opinion of June 30, 1966, page 62, the court below wrote:

"The Supreme Court of the United States in the Button and Brotherhood cases gave constitutional dimension to the rights of minorities or economically disadvantaged to join forces to protect their legal rights. . . .

"(These) cases . . . indicate that groups seeking legal services . . . are entitled to constitutional protection against limitations by the Bar".

Why?

In NAACP v. Button, 371 U. S. 415 (1963), and Brotherhood of Railroad Trainmen v. Virginia, 377 U. S. 1 (1964), the Supreme Court struck down certain Virginia statutes and rules of court regulating the practice of law. As the court wrote in Button, at 429-30,

"(T)he First Amendment . . . protects vigorous advocacy, certainly of lawful ends, against governmental intrusion. . . . In the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government, federal, state and local, for the members of the Negro community in this country. It is thus a form of political expression. . . . (U)nder the conditions of modern government, litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances".

And, in Trainmen:

"Laymen cannot be expected to know how to protect their rights when dealing with . . . carefully counselled adversaries, cf. Gideon v. Wainwright . . . , and for them to associate together to help one another

to preserve and enforce rights granted them under federal laws cannot be condemned as a threat to legal ethics. The State can no more keep these workers from using their co-operative plan to advise one another than it could use more direct means to bar them from resorting to the courts to vindicate their legal rights. The right to petition the courts cannot be so handicapped".[5]

It is not that States have no power to regulate the practice of law, but in dealing with the right to petition the courts, as with other First Amendment rights, a penal statute overly broad and sweeping, capable of inhibiting beyond its necessary and legitimate purpose the exercise of First Amendment rights will not be tolerated. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity": Button, 371 U. S. at 433. Also see Trainmen, 377 U. S. at 5-8, and especially Dombrowski v. Pfister, 380 U. S. 479 (1965).

While the present case concerns the incorporation of Community Legal Services to provide services to those who live in the area of "poverty" and to low income citizens, the rights of those citizens to petition the courts and otherwise to speak and associate thus to secure redress of grievances are, of course, at stake here. The incorporators of Community Legal Services may properly raise the constitutional rights of these citizens: Griswold v. Connecticut, 381 U. S. 479, 481 (1965); Pierce v. Society of Sisters, 268 U. S. 510 (1925). The opinion of June 30, 1966, treats at length of the crucial importance of these rights to low income

---

[5] For an extended analysis of these cases and the right to petition the courts, see Zimroth, "Group Legal Services and the Constitution", 76 Yale L. J. 966 (1967).

citizens of Philadelphia and elsewhere throughout the United States.

The following, from the opinion of the court below, June 30, 1966, might well be repeated here (This opinion writer knows poverty. And, as Justice Fortas remarked in his address before the Judicial Conference of the Second Circuit on July 2, 1966: "(J)udges have a kinship with poverty . . . they are the most over-privileged and underpaid members of our Society") :

"During more than 25 years of practice among the poor and during the tenure of this opinion-writer as a judge, this Court has seen at first hand the helplessness and bewilderment of the poor when faced with the legalities of our complex society. We have had the benefit of many witnesses in this proceeding who have testified clearly and convincingly with regard to the many areas on which the poor desperately require legal assistance. Moreover, in recent years numerous surveys and a growing literature has documented both the extent and desperateness of that need. [6] The Court will not here attempt to review all of the cases. However, a few should be pinpointed for it is appreciation of that need which underlies the program for legal services to the poor which is proposed here and elsewhere in the nation.

---

[6] See generally, Cahn and Cahn, The War on Poverty: A Civilian Perspective, 73 Yale L. J. 1317 (1964) ; Carlin and Howard, Legal Representation and Class Justice, 12 U. C. L. A. L. Rev. 381 (1965) ; Cheatham, A Lawyer When Needed: Legal Services for the Middle Classes, 63 Colum. L. Rev. 973 (1963) ; Frankel, Experiments in Serving the Indigent, 51 A.B.A.J. 466 (1965) ; Katzenbach, Extending Legal Services for the Poor: A Symposium, 49 Mass. L. Q. 293 (1964) ; Proceedings of H.E.W. Conference on the Extension of Legal Services to the Poor (1964) ; Schwartz, Foreword: Group Legal Services in Perspective, 12 U.C.L.A. L. Rev. 279 (1965).

"The Poor and Their Families

"The report to the National Conference on Law and Poverty aptly notes (Report, p. 6), 'Poverty takes its toll in deteriorating human relationships . . . while smoldering domestic misery erupts, the members of the family need legal as well as other kinds of help.'

"Divorce for the poor is often impossible because of the legal costs involved. Divorce poverty style is plain common 'separation' and the spouse soon after is taking up with another. Result: broken families that remain broken; denial of opportunity for remarriage; illicit relationships and illegitimate children. (See: Paulsen, H.E.W. Conference Proceedings, pp. 18-20; Carlin and Howard, Legal Representation and Class Justice, 12 U.C.L.A. Law Rev. 38, 413-414 (1965).

"Wife beating and child abuse and child neglect are more frequent among the poor. The abused require legal protection but so do the accused.[7] Illegitimacy raises numerous legal problems relating to Social Security benefits, veteran benefits, and support proceedings, adoption proceedings and other areas.[8]

"The protection of juveniles is another area urgently requiring the services of lawyers. From 50 to 125 cases a day are typically heard by the Juvenile Division of the County Court every day. The juveniles

---

[7] Report to National Conference on Law and Poverty, page 9, notes that in *less than 10%* of the neglect cases in New York were parents represented by counsel:

"Yet, defending a child-neglect charge often requires subpoenas of medical records, cross-examination of professionals, rebuttal of a social investigator's observations, and evaluation of the home environment. If neglect is found, the children may be sent to city shelters or receiving homes where they are frequently mixed with accused delinquents. Often the parents are ignorant of how to reclaim their children if their situations should change for the better."

[8] See Polier, Problems Involving Family and Child, National Conference on Law and Poverty, Conf. Proc., pages 18-19.

generally are unrepresented, even though commitment and stigma may follow. It has been reported that in the major cities of this country, less than 10 per cent of the adjudicated delinquents were represented by counsel.[9] The criteria for detaining juveniles are vague, and typically weighted against the poor.[10] The need for legal assistance is obvious. As the Report of the Public Service Committee points out (p. 11):

" 'Of all the places where the law has failed to supply appropriate counsel to the indigent, Juvenile Court proceedings are most in need of attention. It is painful to consider what apparitions are conjured in the mind of a boy herded through that system by the words: "law", "judge", "court", and "lawyer" '.

"The Poor as Tenants

"Nowhere is the need for legal services greater than in the area of housing. 'The poor inhabit the slums and the slums dominate their lives,'.[11] In the midst of the rats, refuse, cold flats, leaky ceilings, peeling plaster, perilous stoves, absence of fire prevention devices, dilapidation and dinginess, motivation withers and crime incubates.

"The slum tenant seldom has counsel to assert his rights. Even to report code violations requires knowhow that the poor man does not have.[12] If he does

---

[9] See Time Magazine August 21, 1964, page 66; see also Isaacs, "Should a Right to Assign Counsel be Established in Juvenile Court Proceedings," 15 Juv. Ct. Jud. 1 (Spring 1964); McKesson, Right to Counsel in Juvenile Proceedings, 45 Crim. L. Rev. 843 (1961).

[10] See generally, Alexander, Constitutional Rights in Juvenile Court, 46 A. B. A. J. 1206 (1960); Elson & Rosenheim, Justice for the Child at the Grassroots, 51 A. B. A. J. 341 (1965); Paulsen, Fairness to the Juvenile Offender, 41 Minn. L. Rev. 547 (1957).

[11] Report, National Conference on Law and Poverty, page 13.

[12] See LeBlanc, Landlord-Tenant Problems, H. E. W. Conf. Proc., page 51.

report a violation, he may be subject to retaliatory evictions. Municipal enforcement, at best, is difficult.[13] City officials often hesitate to act because condemning a building simply means more evicted tenants. Landlords are knowledgeable in the techniques of delay and postponement; they are well represented; it is often cheaper to pay the fines than to make repairs.

"Leases and laws favor the landlord; the tenant is readily evicted, defenses are limited; after eviction he owes costs; often the first notice of an action against him is a default order of eviction giving 24 hours to vacate.[14] Even in public housing the poor are beset with problems resulting often from arbitrary application of standards of eligibility and grounds for eviction.[15]

"The Poor and the Public Authorities

"The lives of the poor are inextricably bound up with government authorities. Some eight million persons are on relief and welfare agencies have wide discretion in passing on applications. Assistance is often denied on arbitrary grounds. Dubious methods are often employed to check continuing eligibility. The benefits are frequently wrongly computed. Adverse decisions are seldom appealed. In general, few lawyers are willing to take these cases.

"The poor likewise need assistance in dealing with the education authorities. We leave aside the pressing question of *de facto* segregation still plaguing our

[13] See Note: Administration and Enforcement of the Philadelphia Housing Code, 106 U. Pa. L. Rev. 437 (1958); Note: Enforcement of Municipal Housing Codes, 78 Harv. L. Rev. 801. (1965); Levi, Problems Relating to Real Property, National Conference on Law and Poverty, Conf. Proc. pp. 3-4.

[14] LeBlanc, Landlord-Tenant Problems, H. E. W. Conf. Proc., pages 51, 53-54.

[15] Sparer, The Poor Man's Lawyer and Government Agencies, National Conference on Law and Poverty, Conf. Proc. pp. 41-43.

urban cities, as one which may be handled on a broader scale. But consider the case of the youngster suspended or dismissed from the school on the basis of unsupported charges without proper hearing. Such acts affect the entire course of a child's life. Yet seldom is counsel available to rectify wrongs or to help the child and parent who have been denied what Justice Holmes called 'the rudiments of fair play.'

"We have only mentioned a few areas; there are, of course, many more where legal representation of the poor before governmental agencies is desperately needed, such as public housing, Social Security and veterans' rights. The new field of Medicare will undoubtedly add to the list.

## "The Poor as Consumers

"The fact that the poor have little money to spend does not immunize them from consumer problems. Numerous surveys have shown that substantial numbers of today's poor meet with exploitation in the market place, succumb to the lure of 'no money down' slogans, and become hopelessly entangled in installment debt.[16]

"The poor generally spend more than they earn; the average deficit for low-income families in 1961 was $285. Thirty-two per cent of families with incomes under $3,000 had installment debts for cars, durables, or household repairs. In 9 per cent of the families with incomes under $2,000 installment payments took 20 per cent or more of their income; in 4 per cent it took

---

[16] See generally, Caplovitz, The Poor May Pay More (1962); Kessler, Protection of the Consumer Under Modern Sales Law, 74 Yale L. J. 262 (1964); Retail Installment Sales—Consumer Protection in Pennsylvania, 4 Vill. L. Rev. 408 (1959); Dunham, Consumer Credit Problems of the Poor—Legal Assistance as an Aid in Law Reform, National Conference on Law and Poverty, Conf. Proc. page 9; Caplovitz, Consumer Problems, H. E. W. Conf. Proc., p. 61.

40 per cent or more.[17] All too often the poor buy goods in their own neighborhood stores where markups are unusually high, and are sold goods of inferior quality.

"The problems stemming from missed payments are often horrendous. Collections are achieved by a variety of coercive devices. To the poor, the 'debtor spiral' is well known. First there is the missed payment, this leads to a repossession and often a deficiency judgment; the deficiency judgment leads to a wage attachment; and the wage attachment can lead to a loss of job.[18] Employers, particularly in low-skilled, high-turnover employment are loathe to bother with wage attachments; firing is easier. Creditors also threaten to report purchasers to the welfare authorities; relief recipients are not supposed to buy on credit. These transactions plunge the debtor deeper into poverty. If he loses his job or is evicted from his home because of rent delinquency resulting from consumer debts, the marginal family is sent out on relief or broken up altogether. Obviously there is a need for legal services at many points along the spiral.

"The problems stemming from fraudulent business practices also require legal assistance. In the world of the poor, 'bait advertising', 'switch sales', reconditioned goods sold as new, misrepresentation of merchandise, unscrupulous sales techniques are prevalent. The rule of 'caveat emptor' is a fact of life; the buyer keeps with his bad bargain.

"The poor consumer seldom has the time, money or knowledge to institute action against his seller. Indeed, most have no idea of what their remedies are or where they could seek aid. In one survey of the poor

[17] The Most for Their Money, Report of the President's Panel on Consumer Education for Persons with Limited Income, page 2, (1965).

[18] See Caplovitz, Consumer Problems, H. E. W. Conf. Proc., pp. 61, 65.

when asked directly where they would go for help if they found themselves being cheated by a merchant, some 64 per cent did not know. They could not name any of the community agencies equipped to deal with these problems, such as the Legal Aid Society, or the Better Business Bureau. Only 3 per cent of the families said they would seek aid from private lawyers.

"The Poor and Equal Opportunity

"Despite the tremendous strides this nation has made in the past decade to provide equal opportunities to all of its citizens, the poor in particular still face numerous discriminatory practices in their daily lives. It is not arguable that racial discrimination in housing,[19] in education,[20] in employment,[21] and in other areas, still abound, contributing heavily to the poverty of Negroes and Puerto Ricans, adding to the pathology of despair and defeat that characterizes the poor.

"The correction of these abuses almost invariably requires help. The fact of discrimination is particularly difficult to prove.[22] It is often hard to determine where the legal problems of the poor leave off and those of race begin. Those seeking to implement their rights are frequently frustrated and harassed not only by citizens at large but by agents of the law as well—

[19] See Horowitz, Fourteenth Amendment Aspects of Racial Discrimination in "Private" Housing, 52 Cal. L. Rev. 1 (1964); Pearl and Terner, Fair Housing Laws: Design for Equal Opportunity, 16 Stan. L. Rev. 849 (1964).

[20] Maslow, De Facto Public School Segregation, 6 Vill. L. Rev. 353 (1961); Comment, De Facto Segregation—A Study in State Action, 57 Nw. U. L. Rev. 722 (1963).

[24] See Countryman, The Constitution and Job Discrimination, 39 Wash. L. Rev. 74 (1964); Conference, Toward Equal Opportunity in Employment, 14 Buffalo L. Rev. 1 (1964); Kovarsky, Apprentice Training Programs and Racial Discrimination, 50 Iowa L. Rev. 755 (1964).

[22] Note, An American Legal Dilemma—Proof of Discrimination, 17 U. Chi. L. Rev. 107 (1949).

police, magistrates and other public officials. Even when public officials are anxious to prevent discrimination, the administrative machinery provided for processing complaints before such agencies as the Commission on Human Relations is often so complex and time consuming as to discourage the ordinary citizen from proceeding on his own.[23] These factors intensify the need for lawyers in this sensitive and vital area.

"We have, as noted, dealt only with a few areas. The criminal field is, of course, a major area in which extended legal services are required.[24] Many others could also be mentioned. The need is as varied as are the situations of daily living".[25]

The statute and the canons addressing the practice of law by corporations and the presence of a lay intermediary here raised by exceptants have certain legitimate purposes: (1) Preventing harm to the client from any conflict of interests; (2) safeguarding the exclusive lawyer-client relationship; (3) preventing the commercialization of the practice of law. See Comment, "Practice of Law by Lay Organizations", 72 Harv. L. Rev. 1339 (1959). It cannot be said that nonprofit corporations making the services of lawyers available to the poor open the way to commercialization of the profession. "[N]o monetary stakes are involved": Button, 371 U. S. at 443. Similarly, "Objec-

---

[23] CF. Note. The Right to Equal Treatment: Administrative Enforcement of Anti Discrimination Legislation, 74 Harv. L. Rev. 526 (1964.)

[24] The criminal field, for example, is obviously a major area, which we have not discussed. The need for services here have been well documented. See generally, Note, Effective Assistance of Counsel for the Indigent Defendant, 78 Harv. L. Rev. 1434 (1965); The Problem of Adequate Representation of Indigent and Other Defendants in Criminal Cases: A Panel, 36 F. R. D. 129 (1965).

[25] We shall subsequently discuss the kind of services needed. Obviously the type of legal services which may be suitable for the large corporation or person of means will not do for the poor.

tion to the intervention of a lay intermediary who may control litigation or otherwise interfere with the rendering of legal services in a confidential relationship, also derives from the element of pecuniary gain": Button, 371 U. S. at 441. That element is absent here. As the Ohio court wrote in Azzarello v. Legal Aid Society of Cleveland, supra, a nonprofit corporation making legal services available to the poor, here C. L. S., is "only the channeling agency through which the funds of donors or public departments are given in response to a recognized public need". CLS does not and cannot in any way interfere with the relationship of lawyer and client. The foremost responsibility of a CLS staff lawyer is independently to serve his client with the same fidelity as if the client had engaged the services of the lawyer on a fee basis.

The real question is one of preserving the lawyer-client relationship and enforcing the lawyer's oath and professional standards. As already stated, if the Pennsylvania statute could be read absolutely to prohibit nonprofit corporations making legal services available to the poor, as we have seen it cannot be, it would assuredly run afoul of the Constitution as insufficiently narrow and specific in its impact on the First Amendment rights of low income citizens. Without impinging upon these rights, there remain to the State other more sensitively honed ways to achieve its purposes. Cf. Griswold v. Connecticut, supra. The State can, by legislation, directly address its legitimate purposes. It can, and it does, scrutinize candidates for admission to the bar. Bar associations can, and do, accept complaints, investigate and discipline. And, most especially, the courts of this Commonwealth as those of the other States have clear and undoubted continuing power to enforce professional standards.[6]

---

[6] The standard exclusive reliance, at the base of exceptants' arguments here, upon a money nexus, as if fees passing from client

This matter has yet another constitutional dimension. It seems quite clear that we are on the threshhold of a decision declaring the poor man's equal and affirmative right of access to the courts in every type of litigation or legal trouble that engulfs him. Williams v. Shaffer, 385 U. S. 1037 (January 23, 1967), would have reviewed a Georgia statute requiring security as a condition of a judicial hearing on eviction. Certiorari was denied but Justice Douglas dissented from the denial of certiorari. Justice Douglas, the Chief Justice joining, wrote:

"We have recognized that the promise of equal justice for all would be an empty phrase for the poor if the ability to obtain judicial relief were made to

---

to lawyer can only assure a lawyer's attention to his client, is paradoxical. Karl Llwellyn long ago noted its difficulties. ". . . to a degree which distresses, in the main, rather more than elsewhere, in the larger city the pressure for fees is tending to disrupt any clear coordination of interest between the lawyer and most of his clients. Frequent results run all the way from practical hijacking through mere overcharge into distortion of the lawyer's own judgment in advising and into the occasional ruination of a case by fussbudgeting activity to justify a fee": The Bar's Troubles, and Poultices—And Cures?: 5 Law and Contemp. Prob. 104, 107 (1938). As petitioners argued to the Supreme Court in United Mine Workers v. Illinois State Bar Association, petition for writ of certiorari, pp. 23-24, cert. granted 386 U. S. 941: "The chief concern should not be as the Illinois Supreme Court has appraised it, i. e., the method the attorney receives his pay. Indeed, since the decision herein predicates the desired personal relationship between attorney and client upon payment of an attorney fee, the legal profession is thus cast in terms of a business and reduced to such a status". (UMW is the third case in the line of Button and Trainmen to reach the Supreme Court. It concerns a union hired and salaried lawyer to provide legal services to members in workmen's compensation cases.) It has long been the lawyer's responsibility "never (to) reject from any consideration personal to myself, the cause of the defenseless or oppressed, or delay any man's cause for lucre or malice". It is this professional responsibility upon which reliance must be placed and which must be enforced.

turn on the length of a person's purse. It is true that these cases have dealt with criminal proceedings. But the Equal Protection Clause of the Fourteenth Amendment is not limited to criminal prosecutions. Its protections extend as well to civil matters. I can see no more justification for denying an indigent a hearing in an eviction proceeding solely because of his poverty than for denying an indigent the right to appeal, . . . the right to file a habeas corpus petition, . . . or the right to obtain a transcript necessary for appeal. . . .

". . . Though a State may not constitutionally be required to afford a hearing before its process is used to evict a tenant, having provided one it cannot discriminate between rich and poor. It cannot consistently with the Equal Protection Clause provide a hearing in such a way as to discriminate against some 'on account of their poverty' ".

Button and Trainmen establish that the State may not *interfere* with the rights of persons to petition the courts and to speak and associate together so to do. But there is also in those cases the kernel of a decision that the State is obliged to assure that the courts are open and to provide the necessary counsel to make the courts effectively available to the poor citizens. Button and Trainmen rest on the proposition that all persons have a right to petition the courts and that counsel is necessary to the exercise of that right. The correlative proposition that counsel may be necessary to assure a fair hearing is not a new constitutional proposition. In Powell v. Alabama, 287 U. S. 45, 68-9 (1932), the court wrote:

"The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of the law. If charged with crime, he is incapable, generally, of determining for himself whether the

indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect. If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense".

Powell established that, if not otherwise available, counsel must be appointed in the presence of this necessity. Gideon v. Wainwright, 372 U. S. 335 (1963), found this necessary in all serious criminal cases. A similar necessity obtains in many civil cases, as the court found in Button and Trainmen and as this court discussed in its opinion of June 30, 1966.

The right to appointed counsel in civil cases was hallowed at common law. Henry VII's Statute of 1495, 11 Henry VII, c. 12, established the right of poor civil plaintiffs to proceed without prepayment of costs or security and with appointed counsel. That statute was adopted by the Colonies. See e.g., the Papers of Thomas Jefferson, II, 628.320, 658-61, and was respected in their courts, e.g., Morris, Select Cases of the Mayor's Court of New York City, 1674-1784, pp. 176-77 (1935). Indeed, the statute has been adopted in Pennsylvania: Report of the Judges, 3 Binney 593,

617 (1808) ; Roberts, Digest of British Statutes in Force in Pennsylvania, pages 116-17 (2d ed., 1847). And in Willis v. Willis, 20 Dist. R. 720 (1920), relying on that adoption and on article I, sec. 11, of the Pennsylvania Constitution, "All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay", the statute was held in force here.

Thus, the provision of legal services is not a gratuitous function but constitutionally sanctioned.

The exceptants urge upon this court the opinion of the Appellate Division of the New York Supreme Court, First Department, Application of Community Action for Legal Services, Inc., supra.

There, three proposed legal service programs in New York City, Community Action for Legal Services, Inc., New York Legal Assistance Corporation and Harlem Assertion of Rights, Inc., had applied to the appellate division, pursuant to N. Y. Penal Law, §280, for approval and incorporation.[7] While inviting "the re-submission of proposals free from the infirmities in the present applications, with the suggestion that any new applications be submitted promptly, in final form, and in succinct integrated documents," the court, at the hand of Justice Breitel, rejected the applications.

That case bears little resemblance to the matter here. The proposed New York corporations, intertwined and proliferating, were most cumbersome, their structures most confusing. The boards of the proposed corporations would have had 67 members, many with alternates. There were to be various advisory committees. The executive director of one of the

---

[7] A fourth application was also pending before the court.

corporations was to be designated by still another outside agency. Each corporation was to be empowered to contract with other agencies and organizations for the provision of legal services and each was related to the other in one or various ways. "The interposition of supervising licensed corporations and the unlimited power of contracting out of legal services to delegate, sub-delegate, and sub-sub-delegate agencies is a thicket through which none could penetrate". Even "sketchily described", the structure of the three proposed corporations required four full pages of the court's 15-page opinion.[8] The striking contrast between the proposed New York corporations and their unwieldy complexity and Community Legal Services, Inc., is sufficient itself to render the New York opinion and matters that preoccupied that court inapposite here.

We feel compelled to say as well, however, that the principles invoked by the New York court in attempting to thread the complex corporate structures before it and finally to reject incorporation seem to us ill founded. However sympathetic we may be with their elaboration in the face of the hydra-proposals before the New York court, we do not think the principles invoked there will themselves bear scrutiny.

Three assertions in particular guided the New York court, 274 N. Y. S. 2d at 787:

1. "(T)he Court is concerned that such a corporation be directly controlled and supervised by lawyers summarily responsible to the Court for the maintenance of professional standards. . . . Because the

---

[8] The court complained a great deal about the piecemeal submission of the applications, their reliance on cross-incorporations by reference, their general failure to be succinct and clear.

Court must be able to supervise those licensed by it, it must insist upon directorates of sufficiently small size, palpable groups amenable to its discipline and sanction in the event there is complaint that professional standards have been violated".

The majority of the 20 members of the board of CLS are, and by provision of the bylaws, must be, lawyers. And CLS as a corporation, by express provision of its charter, is governed by the Canons of Professional Ethics and Rules of Professional Conduct. Whether this was so, or would be so, in the proposed New York corporations was at the least unclear. Nonetheless, this court is unable to agree that professional standards must fail of enforcement simply because some members of a legal assistance corporation, or even a majority of the members, happen not to be lawyers. The simple fact is that the lawyers participating in legal service programs are, and remain, directly responsible to the courts. See, e.g., Pa. R. C. P. 205; Schofield Discipline Case, 362 Pa. 201 (1949). Note, too, the responsibility placed on lawyers by Canon XLVII:

"No lawyer shall permit his professional services, or his name, to be used in aid of, or to make possible, the unauthorized practice of law by any lay agency, personal or corporate".

Initially, and finally, whatever form the corporation may take, however complex or simple, however infused with lay participation, the lawyers participating in legal service programs bear enforcible responsibility for the conduct of the program in accord with professional standards. Laymen who stray into unauthorized practice, of course, remain subject to criminal prosecution by law enforcement officials and to civil injunction by the organized bar.

Furthermore, we are unable to accept the New York court's "bad man" theory of lawyers associated with

legal assistance organizations; to the contrary. Nor are we able to discover what unspoken evils that court saw lurking in lay participation. Suffice it to reaffirm what was written below in the opinion of June 30, 1966, at page 66:

"The poor, of course, *should* have a voice in the program. The questions which come before the Board of Directors of a Legal Services program are not purely legal questions. Involved are such issues as where the neighborhood offices should best be located, the standards and employment of staff, and what kinds of activities will be most successful in educating the poor as to their legal rights. The poor can give valuable insights on the problems they face and the nature of the help needed. Surely, no one can doubt that the poor not only have *vital* interest but *unique* knowledge to contribute.

"There are further reasons for involvement of the poor. There has been entirely too much of providing services *for* them, doing things *to* them, instead of doing things *with* them. One of the significant effects of involving the poor is that it teaches them that they have a stake in the law and in their own destinies. Their involvement needs to be achieved sensitively perhaps, but it must be achieved all the same or a basic objective of the war against poverty will fail. We find that C. L. S.'s involvement of the poor is not an undesirable but a *desirable* goal, properly pursued". (Italics in opinion).

As two respected commentators have suggested, the consumers of legal services must have a voice in determining the nature and adequacy of those services: "Quantity and quality are a matter of judgment —and that judgment should rest in significant part and perhaps ultimately, with the consumer". That is the point of the statutory requirement of participation by the poor, residents of the area and members of

the groups served, in the development, conduct and administration of programs funded by the Office of Economic Opportunity: Economic Opportunity Act of August 20, 1964, sec. 202(a)(3), 42 U.S.C.A. §2783, 78 Stat. 516. It is a sound point and its realization in legal services programs in no way prejudices the maintenance of professional standards.

2. "There can be no effective professional or disciplinary supervision by the Court or the agencies interposed over such a multitude of licensed corporations operating competitively in the same area": 274 N. Y. S. 2d 786.

The particular multitude facing the New York court may well have given pause, but so does the court's conclusion, based again on an undue preoccupation with professional discipline:

"Hence . . . the Court should not license more than one legal assistance corporation, using federal economic anti-poverty funds, in any one area, as large as a county or at least half a county": 274 N. Y. S. 2d 786.

We are unable to discover any judicially cognizable reason why the poor in any given area should be limited to securing legal assistance from one program with a monopoly. Equally important, county lines do not necessarily coincide with any social reality. Particularly in urban areas, different neighborhoods may justify and indeed require different kinds of programs. One of the purposes of the poverty program and legal services is precisely to pierce the city-wide perspective, to recognize and serve the cities' discrete communities and to assist them in defining and articulating their own particular interest. First attention is due this social reality, not any artificially imposed perspective which may serve only further to blunt the recognition and statement of desires of particular communities within the city.

3. "Each of the pending applications in setting forth purposes is unsatisfactory in the indiscriminate mingling of social goals and legitimate legal practice": 274 N. Y. S. 2d 789.

The New York court joins several objections in this one. It found the proposals deficient in "not prohibiting entirely and without evasive qualification political, lobbying, and propagandistic activity": 274 N. Y. S. 2d 788. "It would be one thing to allow neighborhood law offices to handle poor men's credit unions", the court wrote, but "it would be quite another thing to have them handle, advise and represent political factions or organizations of social and economic protest, however worthy", 274 N. Y. S. 2d 789. ". . . the use of the law and its institutions on achieving social and economic (as distinguished from legal) justice are especially illustrative of indiscriminate mingling of goals".

Are the poor to be denied a lawyer's advocacy and left without his peculiar assistance in forums beyond the judicial or in causes whose ends encompass social and economic as well as legal justice? Surely this is a narrow view of the law. Note Canon XXVI:

"A lawyer openly, and in his true character may render professional services before legislative or other bodies, regarding proposed legislation and in advocacy of claims before departments of government. . . ."

Lawyers have and do offer advice and their skills as advocates to interest groups, political parties, factions and organizations, and indeed, in the pursuit of the client's perception of "social and economic justice", to all manner of individuals, associations, corporations and institutions who pay the lawyer's fees. Our society provides many forums in which social change can be realized. The courts are not the least of these, nor all of them. As the social history of any interest group, from unions to feminists, to trade associations, to

forums, to the organized bar itself, lawyers have served in the courts *and* in other forums with distinction, for any of the other forums may be equally crucial to important change and in each a lawyer's skills may be relevant. Any thorough view of the profession, therefore, must encompass, as the history of the profession does, the lawyer's role as advocate in court and outside. As consumers of injustice, legal, social and economic injustice, the poor can hardly be denied the varied assistance of the profession. With a *commitment* to the war on poverty, if it be a serious commitment, must come the commitment of the best of professional talents and their full range.

No acceptable jurisprudence can fail to recognize that "legal" rights have an intimate relation to social and economic justice, nor that those ends are legitimately sought in the judicial forum. Consider some of the cases defining rights most important to the poor. Sherbert v. Verner, 374 U. S. 398 (1963), holding that unemployment compensation cannot be conditioned on the surrender of constitutional rights. Edwards v. California, 314 U. S. 160 (1941), holding that indigents may not be excluded from a State or denied the right of free interstate movement simply to protect the State's purse. Collins v. State Board of Social Welfare, 248 Iowa 369, 81 N. W. 2d 4 (1957), and Department of Mental Hygiene v. Kirchner, 60 Cal. 2d 716, 388 P. 2d 720 (1964), respectively striking down maximum family grants and relative's responsibility on equal protection grounds. Rouse v. Cameron, 373 F. 2d 451 (D. Cir., 1966), stating the right of one civilly committed to treatment. Landman v. Peyton, 370 F. 2d 135 (4th Cir., 1966), effectively altering the duties of prison administrators to those incarcerated. Office of Communication of the United Church of Christ v. F. C. C., 359 F. 2d 994 (D. C. Cir., 1966), and Scenic Hudson Preservation Conference v. Fed-

eral Power Commission, 354 F. 2d 608 (2d Cir., 1965), defining the rights of the public and individuals and groups therein to participate in administrative decisions and the obligations of the decision maker to consider the alternatives thus posed.

Justice is justice. It cannot be neatly subdivided or served in parts. Consider the address of Mr. Justice Fortas concerning justice and the value of legal services programs (Annual Judicial Conference of the Third Circuit, September 8, 1966) :

"We pride ourselves upon being a society governed by law. It is law that binds us together—that integrates our society—that sets rules of fair play—rules providing security against assault, oppression, overacting. That is the theory, the principle of our society.

"But one of the shocks of recent events has been the realization of the extent to which the vast population of our urban ghettos has lives in a world outside the law. To them, the law has been an alien force. To them, it has not represented a compact to which they are parties. It has been the system devised by the establishment—of the establishment—for the establishment.

"To them, the law has been their enemy. It has been the power behind the arresting policeman's tyranny, as it appears to them; it has provided the mysterious arsenal of the probation officer and the juvenile court official; it has been the powerful weapon of the money lender, the landlord, the installment dealer.

"It is 'the law' that evicts them from their homes; the 'law' that repossesses their furniture; the 'law' that seizes their children and spirits them away; the 'law' that withholds their social welfare payments.

"They do not regard the law as a set of rules in whose benefits they share. On the contrary, they regard it as a cold deck—a fixed pack of cards being used in a game which they must play—as victim, not as participant; as outsider, not as party.

"Similarly, they regard lawyers as the tool of the establishment—of the loan shark, the money lender, the furniture dealer, the cop.

"Orison S. Marden, president-elect of the American Bar Association, has summed it up in these words: 'The law,' he said, 'known in the ghetto as "the man," seems to the poor man always to be on the other side.'

"It is this attitude that must be changed, I think, if we are to have a society in which we can safely and proudly live. The poor, the Negro, the occupant of the ghetto must feel that he is a participant in the rule of law. He must feel that the law is *his* precious profession as well as that of his adversaries. But now, the circumstances of life are calculated to create precisely the opposite attitude".

The recent exhaustive and heavily documented report of "The President's Commission on Law Enforcement and Administration of Justice", of which the Hon. Nicholas deB. Katzenbach is chairman (Title: Challenge of Crime in a Free Society, February 19, 1967 (340 pp.), on file in the Executive Office of the President) points up, as has no other study, the urgent need to create a better public image and respect for the American police. This is particularly necessary in the large heavily populated cities all over America and is of vital importance in the city slums and ghettos. This report states, at page 99:

"There is much distrust of the police, especially among boys and young men, among the people the police most often deal with . . . often policemen are sneered at or insulted on the street. Sometimes they are violently assaulted. Indeed, everyday police encounters in such neighborhoods can set off riots . . . (T)o say that there is much distrust of the police among members of minority groups is not to say that all members of minority groups distrust the police . . . however, the differences in attitude by race are striking".

If there is one single thing above all others that the effective nationwide administration of the Community Legal Services program will accomplish, we feel safe in saying, it will be the greater respect for and confidence in the American police by the slum dwellers, the families who live in ghettos, be they Negro, Puerto Rican, Mexican-American or the average poor white American. With the greater protection of the American poor against all the evils under which he has suffered in the abuse of legal process, both civil and criminal, the "law" (as the police is known to him) will no longer be his enemy. The "law" will be his friend and he will respect him. We have long looked for an antidote to combat the hostility of the ghetto dweller toward the police. This program, hopefully, will provide that much needed catalyst.

Mr. Justice Brennan, addressing the Conference on Legal Services Programs in Warrenton, Va., (November 15, 1966), underscored Justice Fortas' words and added:

"The Economic Opportunity Act and its provision for the legal services program is but another, if perhaps the most important, evidence that law is again coming alive as a living process responsive to changing human needs. It has its concomitant in judicial decision making where the shift is to justice and away from fine-spun technicalities and abstract rules. We find this in a 1964 American Bar Association report:

" '(T)his new jurisprudence constitutes . . . a recognition of human beings, as the most distinctive and most important feature of the universe which confronts our senses, and of the function of law as the historic means of guaranteeing that pre-eminence. . . . In a scientific age it asks, in effect, what is the nature of man, and what is the nature of the universe with which he is confronted. . . Why is a human being important; what gives him dignity; what limits

his freedom to do whatever he likes; what are his essential needs; whence comes his sense of injustice?' "

"We judges are a resourceful lot", Judge Bazelon has recently written in a view of the legal process that we find most persuasive, "and there are numerous legal doctrines we can use, and do use, every day to avoid seeing what is before us". This address was published as "Justice for Juveniles", the New Republic, April 22, 1967. Judge Bazelon believes that the reality of poverty, the glorious range of strategies that may be pursued in eliminating it, if only we have the heart and the will, cannot be ignored, nor by oversight can artificial limits be placed on those strategies. It is this court's contention that we cannot share the perspective, nor the conclusions of the New York court on legal services. The poor have a grave and acute perception of the facts of society that need to be changed. To the extent the poor wish to call upon lawyers to assist in implementing the change they see appropriate and required, lawyers must be available to them as they are to others.

We, therefore, find no merit in exceptants' objections to the incorporation of CLS. Neither Pennsylvania statute nor the canons bar its incorporation. The New York opinion invoked by exceptants is neither apposite, nor, in its essential analysis of the appropriate response to the legal needs of the poor, well founded.

III

Exceptants again urge, as others did below, that this court must reject the neighborhood law office form of legal services for the poor in favor of "Judicare" or "the English Plan". As the court below held in its opinion of June 30, 1966, page 67, it is not the function of a court considering application for a charter under the Nonprofit Corporation Law to judge whether some alternative application might be superior. Our only

function is to determine that the pending application sets out purposes which are lawful and not injurious to the community, and that has been done, correctly, below. See, e.g., Nottingham Fire Company Charter Case, 394 Pa. 631 (1959).

There is no application for a Judicare or English Plan program before the court. A few excerpts from the opinion of June 30, 1966, pages 67-9, seem appropriate at this point:

"7. The Desirability of Alternate Plans.

"Throughout the proceedings the protestants urged that a 'Judicare' program or the 'Wisconsin Plan' would be more suitable than the CLS program.

"Under the Wisconsin Plan persons of low income would apply to a local Community Action Project office, or local welfare office, or local legal aid society, for a Judicare card. The holder of a card would go to a lawyer of his choice for legal services excluding contingent fee matters, probate and certain other matters. Upon completion of the work the lawyer would bill the State Judicare office at $16 per hour but not to exceed 80% of the State Bar Minimum Fee Schedule. This program is presently being tried in 26 counties in Northern Wisconsin on an *experimental* basis.

"It is not the function of this Court under the Non-Profit Corporation Law to judge between competing applications, Nottingham Fire Co. Charter Case, 394 Pa. 631 (1959). In any event, there is no choice available here between competing applications. OEO does not presently believe that the Judicare type of program is suitable for urban areas and the record is clear that if the present CLS program does not go forward this year, no other program will be available under this grant.

"It is rather remarkable that protestants who are concerned with Federal control should assert a preference for a Judicare plan in which the Federal government may be establishing the minimum fees and

standards of practice for a large segment of the Bar. The CLS program has far less Federal involvment than any Judicare program would have. Likewise, the Bar Association has considerably more control and responsibility than is likely in a Judicare program. Such considerations do not seem to have been thought out by those urging the Judicare plan.

"In any event, for the urbanized area with its teeming masses of impoverished, there are considerations which make the Judicare type of program far less desirable than CLS. We have already mentioned the shortcomings of sending the poor to lawyer lists or to the classified directory to select counsel and the advantages of having a neighborhood CLS office. There is also the danger that a Judicare program would, in a large city, fall prey to a 'runner' system of sending cases to a favored few.

"The CLS program has numerous other advantages. It can develop specialists in such fields as housing, the family welfare and consumer protection. It can more readily ascertain those patterns which require correction and bring the test cases to do so; it can draft the new legislation that is often needed; it can spend the time necessary to provide the imaginative comprehensive services the poor need. These are tasks that a Judicare type of program cannot accomplish nearly as effectively. Finally, there is the important fact that Judicare is far more expensive and thus will inevitably mean that less people would be served. The present grant is little enough when one considers the need; to dilute it further would be a disservice.

"It may be, despite such formidable deficiencies in a Judicare plan, that some aspects of Judicare are adaptable to urban centers.[1] The Wisconsin Plan

---

[1] It may be noted that the English system has been criticized as not serving the poor well. See Harvey, Tenants in Danger, 149-150 (1964).

may offer some valuable insights and the Bar here will undoubtedly do further exploration along these lines. As of now, however, the program before us is the CLS program, no other".

Exceptants, as anyone else, remain free to develop and establish such a program. If, however, they look to the Office of Economic Opportunity to fund it, they look in vain, as the record of this case makes very clear. On a demonstration basis, the Office of Economic Opportunity has funded two "Judicare" programs, one in rural, northern Wisconsin and the other in a small neighborhood in New Haven. Until the results are in and those programs have been evaluated and compared with neighborhood law office programs operating in similar areas, no grants will be made for "Judicare". This decision rests on OEO's expectations about the respective costs of the programs, the character and quality of the legal services they can support, and their advancement of other ends of the war on poverty. This court has no jurisdiction to hear complaint of that decision. Moreover, it seems a reasonable decision, reached after careful scrutiny of the English system and the circumstances of the American poor.

A few words should be added here about the English Plan, which, however, is of limited value. The Legal Aid and Advice Act was enacted in England in 1949. This is a comprehensive plan for providing legal services in civil as well as criminal matters. Its basic principles are that need and eligibility are determined by committees of the law society, composed entirely of lawyers. The client is then entitled to select his own solicitor, who then proceeds completely as if the client came to him in the course of his private practice. The lawyer is paid fees by the State on the same basis that fees are charged in private practice, and his expenses for investigation, experts, summoning of witnesses,

court costs, et cetera, are similarly documented and reimbursed.

At first study, this would seem to be admirable, but, on closer examination and comparison, in first, its appeal to, its impact upon, and its overall responsiveness to a large, diverse, heterogeneous mass of people such as we have in America, especially in the area of the lower middle economic, social and educational poor, it is seriously doubtful to the court that such a system would or could meet the needs of the 35,000,000 American poor of such divergent kind, well known to all of us who have given this subject study in depth.

It is apparent that it is impossible for this court to consider all the alternatives to the petition now before the court. Indeed, the one remaining alternative, the neighborhood law office, the effect upon the same by CLS was only briefly alluded to in the rather lengthy testimony taken during these proceedings. This court, however, in its research on this particular type of legal service, believes that all agencies and instrumentalities of law are founded upon and depend upon the principle of responsiveness. The public, by and large, as studies have shown, has not been responsive to this feature of law service. The average person seeking such services quickly becomes disillusioned because he gets the opinion, and let me say, quite unjustly, that it is a "hand-down" from the "Establishment" of which he is no part and in which he has no interest. He gets the impression that this office is a partner, or competitor, or indeed an antagonist of the Legal Aid Society which he dislikes. He sees the case load mounting steadily with a greatly understaffed office, many of whom are *not* lawyers. As a result, saturation litigation cannot be successfully or adequately handled by a limited and not well paid staff of skillful advocates.

The writer of this opinion refers counsel, on this point, to a brilliant study of this entire subject by Edgar S. and Jean Camper Cahn, the former, Special Assistant to the Director, OEO; the latter (his wife) a member of the District of Columbia bar, published by the Notre Dame University Law School (1966), entitled "What Price Justice: The Civilian Perspective Revisited", 41 Notre Dame Lawyer 927; also, by the same authors, "The War on Poverty: A Civilian Perspective", 73 Yale L. J. 1317 (1964).

The remaining question, it appears to this court, is the basic and fundamental one, whether legal assistance to the indigent has the significance necessary to justify its being a part of the war on poverty. To answer this, it becomes necessary for the legal profession to know the full extent of the *depth* of the OEO legal service. Theodore Voorhees, past president of our own bar and the immediate past president of the National Legal Aid and Defender Association, in the American Bar Association Journal, January, 1967, vol. 53, page 23, made these pertinent and timely remarks:

"Poverty has two aspects: One physical, the other spiritual. It connotes privation: lack of decent housing, shortage of palatable food, inability to earn the money to buy the ordinary necessities of life others take for granted, and the missing of educational and other opportunities for children, perhaps the bitterest of all . . .

"For poverty is also a state of mind. It encompasses defeatism, an absence of hope—not merely hope that has become lost, but often hope that never existed. There is antagonism and suspicion based on lack of education and ignorance. There is gullibility and susceptibility to being victimized by anyone with a smooth

tongue and an ounce of guile. Above all, there is bitterness, deep seated and bordering on hatred, against the whole apparatus of the law. The policeman . . . the police court, the magistrate, the constable and the process server are the enemy . . . The 'Law' . . . is a vague and misunderstood force that seems always opposed to the poor; justice is a concept beyond comprehension . . . In our slums and ghettos—even the quietest of them—there exists a cold war in which the enemy is law. . . ."

The writer of this opinion had occasion to address the annual conference of the National Legal Aid and Defender Association at Memphis, Tenn., on October 4, 1966, on the subject to which the court is now addressing itself. In the address (the full text of this address is on file at the offices of the National Legal Aid and Defender Association, care of American Bar Center, Chicago, and in the Office of Economic Opportunity, Washington, D. C.) the following poem was read:

"How many years can a mountain exist
before it is washed to the sea?
How many roads must a man walk down
before you call him a man?
How many ears must one man have
before he can hear people cry?
The answer, my friend, is blowin' in the
wind, the answer is blowin' in the
wind".

America's poor have been "blowin' in the wind" all these long, long years and nobody has cared enough to cry or even to hear their voices crying.

During this address, this writer had occasion to refer to, and this court repeats with emphasis, its extreme pleasure to see the brilliant young lawyers from

the leading law schools of this country, many of whom were of independent means, who appeared in this court as witnesses and others ready to take the stand in support of this petition. Since that date, June 30, 1966, scores of these lawyers have given thousands of hours of their time, without compensation, in furtherance of its objectives. Regarding the dedicated commitment of these fine young men and many women, all members of our great bar, the writer has this to say, and repeats now:

"Your legal services to the poor will become vividly relevant to the social welfare of these same people. Your protection of these clients in consumer purchases, consumer credit transactions, unscrupulous sales techniques, protection against repossession of household furniture, fraudulent creditors, attachment of wages, will save their jobs and families going on relief . . . The lawyers who appear before me . . . are truly great Americans".

And, speaking to the lawyers of the National Legal Aid and Defender Association in convention in Memphis:

"You lawyers will soon develop the impulse to help the forgotten man, the broken family, over and above his legal problems. You will be deeply concerned, if not indeed dedicated to these people who yesterday you did not know. By *identifying* with them you will give them *identity;* from being nothing yesterday they will develop an image today that yesterday they never knew. The poor of all races need stimulation of the kind that you alone can give them . . . Properly applied, your face-to-face confrontation with people who may be nothing more than a 'cipher' today and on their way to oblivion for some desperate act tomorrow, may not only be changed, but some indeed may be an intellectual inspiration and a joy tomorrow".

Alas, America in its noble origins and long history has now become involved in widening its areas of freedom for the American people. This is another step, long neglected, long overdue, in that direction. A new area of freedom, freedom for those who are unable to pay to consult with and be represented by the best legal talent available in all problems affecting the American family, all of which is provided for by a great government. The American lawyer can be justly proud of this unique event in American legal history.